STATE OF VERMONT
SUPERIOR COURT — ENVIRONMENTAL DIVISION

|  |  |  |
|---|---|---|
| In re Bibby 5-Lot Final Plat | { | Docket No. 189-11-10 Vtec |
| Subdivision & Waiver Application | { | (Appeal from St. Albans Town DRB) |
|  | { |  |

**Decision on the Merits**

Before us in this de novo appeal is an application by Thomas and Yu Bibby ("Applicants") for final plat approval to create a five-lot subdivision of an approximately 29-acre parcel along French Hill Road in the Town of St. Albans, Vermont. Applicants included in their application a request for a waiver from the road frontage requirement for two of the resulting lots. Susan Roush and Lawrence Bruce ("Neighbors"), owners and residential occupants of property adjacent to Applicants', filed a timely appeal of the decision issued by the Town of St. Albans Development Review Board ("the DRB") to approve the proposed subdivision and road frontage waiver request.

Applicants are represented by Brian P. Hehir, Esq. Neighbors are represented by Annie Dwight, Esq. and Claudine C. Safar, Esq. The Town of St. Albans ("Town") entered its appearance and is represented by Vincent A. Paradis, Esq. Interested Person Erik Kilburn is self-represented.

**Procedural Background**

Neighbors raised a number of legal issues in their Statement of Questions, which originally included 25 Questions, some of which with multiple subsections. Applicants and Neighbors then attempted to reduce the number of legal issues that would need to be addressed at trial by suggesting that some of the legal issues raised could be resolved by summary judgment. Applicants filed a motion for summary judgment, requesting either summary judgment or dismissal of 24 of Neighbors' 25 Questions; Neighbors filed a competing motion for summary judgment as to some, but not all of the legal issues raised in their Statement of Questions. Fourteen of Neighbors' 25 questions were subsequently resolved through summary judgment or dismissal. In re Bibby 5-Lot Final Plat, No. 189-11-10 Vtec, slip op. at 27 (Vt. Super Ct., Envtl. Div. Mar. 2, 2012) (Durkin, J.). As a consequence of that pre-trial decision, the legal issues remaining to be resolved at trial were the following:

- Question 2, which asks whether the proposed subdivision conforms to Section 220(2) of the Town of St. Albans Zoning Bylaws and Subdivision Regulations ("Regulations"), which directs that a "proposed development should demonstrate due regard for the protection of existing trees, scenic points, brooks and water bodies and other natural and cultural features of the area." Id.

- Question 3, which asks whether the proposed subdivision will be "compatible with adjacent land uses," as directed by the first portion of Regulations § 220(3).

- Question 4, which asks whether the proposed subdivision will "provide sufficient open space for recreation and . . . safeguard the privacy of area inhabitants," as directed by the second portion of Regulations § 220(3).

- Question 5, which asks whether the proposed subdivision will conform to the prohibition in Regulations § 220(4) that developments "not cause unreasonable congestion or unsafe conditions;" Neighbors pose this Question with a specific reference to the adjacent public road known as French Hill Road and Neighbors' nearby private logging road.

- Question 6, which asks whether the proposed subdivision will comply with the directive contained in Regulations § 221(1)(B) to "wherever feasible . . . [u]tilize common driveways for adjacent lots."

- Question 7, which asks whether the proposed subdivision will comply with the directive contained in Regulations § 221(1)(C) to "wherever feasible . . . [p]roduce the safest, most healthful and attractive building sites for the topography, drainage, soils, vegetation, and other natural features of the property."

- Question 10, which asks whether the proposed subdivision will comply with the directive contained in Regulations § 221(6) to "retain [v]egetation such as trees and shrubs . . . for reasonable screening and aesthetic purposes."

- Question 11, which asks whether the proposed subdivision will comply with the directive contained in Regulations § 221(6) to "maintain[] or enhance[] . . . [v]egetated buffers along stream banks . . . for filtration, erosion control, and aesthetic purposes."

- Questions 13 and 14, which ask whether the proposed shared access way for Lots 3 and 4 (neither of which have road frontage) conforms to Regulations § 400(1), and whether each lot is entitled to the road frontage waiver requested by Applicants.

- Question 19, which asks whether the proposed subdivision will comply with the directive contained in Regulations § 221(5) to "provide[] sufficient [d]rainage [f]acilities . . . to accommodate . . . storm runoff from all roads, lots, and upstream drainage areas, whether inside or outside the development."

When the parties, despite their best efforts, were unable to resolve these remaining legal issues by voluntary agreement, the matter was set for trial. The trial began on September 13, 2012; it had originally been scheduled to be completed in one day. However, during the course of the afternoon of the first day of trial, the Court became aware that the courtroom recording equipment had malfunctioned: while the recorder appeared to be registering recordings from the individual microphones in the courtroom, no playback was available. Thus, the Court concluded that there was no record of the proceedings during the first day of trial. The undersigned gave notice to the parties and requested their thoughts, after they conferred with their respective legal counsel, on how the Court should respond to the lack of a record for the first portion of the trial.

By separate letters, filed with the Court on September 21 and 24, 2012, Neighbors and Applicants, through their respective attorneys, recommended that the Court proceed with the trial, even though the first day of trial had no audio recording. The Court thereafter made arrangements to complete the trial on two additional days that the host courtroom was available. The trial was completed on January 16, 2013 at the Franklin County Superior Court – Civil Division. Once the trial was completed, the Court afforded the parties an opportunity to file and supplement their proposed Findings of Fact and Conclusions of Law.

The Court conducted a site visit with the parties prior to the first day of trial. Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact, Conclusions of Law, and the Judgment Order that accompanies this Decision.

### Findings of Fact

### I. Applicants' Property and Subdivision Layout

1. Applicants presently own a parcel of land on French Hill Road in the Town of St. Albans that contains 29± acres. Their property includes a single family residence, with attached garage, that Applicants occupy as their residence.

3

2. Applicants' property is almost entirely wooded and is generally located at the peak of the highest point of an elevated area. This general area is known as French Hill.

3. Applicants propose to subdivide their property into five lots of various sizes:

- Lot 1 includes 7.5± acres (approximately 3 acres of which is open land) and contains Applicants' residence; an existing driveway will continue to serve as the access to Lot 1;

- Lot 2, containing 6.5± acres, lies easterly from Lot 1 and has its own proposed driveway that will intersect with French Hill Road

- Lot 3, 4, and 5, respectively containing 6.4±, 6.2±, and 2.4± acres, are proposed to share an access way onto French Hill Road. These three lots are westerly of Applicants' Lot 1.

4. All of the proposed lots satisfy the minimum lot size requirements for the applicable zoning districts.

5. Each of the proposed lots and their access ways are depicted on Applicants' site plan, a copy of which was admitted as Exhibit B. Applicants also depicted their proposed lots on an enlarged copy of an aerial photo of the area that also shows neighboring properties, including Neighbors' property. That augmented aerial photo was admitted at trial as Exhibit A.

6. Most of Applicants' property is located in the Rural Zoning District ("Rural District"); only Lot 4 has lands located in the Conservation Zoning District.

7. Applicants' property generally occupies the top portion of French Hill. The topography of the proposed to-be-subdivided land is gently undulating, with a slope towards the east.

8. There can be beautiful views enjoyed from Applicants' property to the northeast, east and southeast, especially from the open area near their existing home and from some portions of the wooded undeveloped areas, especially in the winter months, when the leaves are off the trees.

9. The shared access way for Lots 3, 4, and 5 will travel from French Hill Road and across Lot 5, which has frontage on French Hill Road. The shared access way will then continue onto Lot 3. Applicants' site plan (Exhibit B) includes a depiction of the proposed location for the shared access way. The right of way for this shared driveway will be twenty feet wide with a travel lane of about sixteen feet.

10. Once the access way leaves Lot 5 and travels onto Lot 3, it continues into a circular travel area that will allow traffic, including delivery and emergency vehicles to turn around and travel out the access way to French Hill Road. There will also be two driveway spurs off of the circular travelled area; each of these spurs will serve as a separate driveway for Lots 3 and 4.

4

11.     Lots 3 and 4 do not have frontage on a town road.

12.     Lots 1, 2, and 5 each have frontage on French Hill Road that exceeds the minimum road frontage required for single family dwellings located in the Rural District (175 feet).

13.     The proposed shared access way for Lots 3, 4, and 5 parallels and is located within 10 to 15 feet of the property boundary line that Applicants share with Neighbors. When Applicants or their successors in interest develop the shared access way, trees within the access way will be removed and trees adjoining the access way will remain. Because of the proximity of the proposed shared access way to Neighbors' property, Neighbors will have a nearly unobstructed view of the shared access way from the edge of Neighbors' property.

14.     Development of this shared access way, particularly the circular travel area, may cause construction vehicles to cross the parties' shared boundary and enter onto Neighbors' property, due to the close proximity of the shared drive to Neighbors' property. If these construction vehicles do enter onto Neighbors' property, which the Court considers likely, the construction activities are likely to disturb or destroy an historical stone wall that generally follows the parties' shared boundary line.

15.     Applicants plan to complete the subdivision of their land and, if they are granted a permit for their proposed subdivision, to sell the individual lots to others who will complete the driveways, access ways and residential development of the individual lots. Applicants do not intend to complete any site development.

16.     Applicants do not intend to develop the subdivided lots themselves, but rather suggest that the buyers of the individual lots will perform the construction and development work, including the shared driveway for Lots 3, 4, and 5 and the separate driveway for Lot 2. While Applicants' proposal appears to be allowed by the Regulations, we have some concerns, since Applicants' site plan only identifies the location and width of the shared driveway and right-of-way, but does not provide construction details, including the depth of the road bed and materials to be used, and what, if any, culverts will be installed in wet areas. Applicants' engineer testified that such details could be determined when the future developers of the lots begin construction.

## II. Surrounding Neighborhood

17.     Neighbors own a parcel of land that adjoins Applicants' property along the easterly boundary of Applicants' property. Neighbors' land contains approximately 190 acres that

includes open fields, wooded lands (including areas that Neighbors use to harvest firewood and timber for other uses), and Neighbors' principal residence.

18. The area between Neighbors' home and Applicants' boundary line is almost entirely wooded. Neighbors' home lies downslope from Applicants' property. Neighbors have no view of Applicants' property from their home, but they can view the westerly portion of Applicants' property from the easterly portion of their (Neighbors') property.

19. Neighbors maintain a logging road on their property, near the boundary line with Applicants' property. Neighbors' logging road travels from its intersection with French Hill Road, parallels and then abuts the parties' common boundary line until the logging road then branches off in a westerly direction, away from Applicants' property. Where Neighbors' logging road branches off is just prior to the location of Applicants' proposed circular portion of the shared access way on Lot 3.

20. After Neighbors' logging road branches away from the parties' common boundary, the road reaches a log staging area that Neighbors and their forestry contractors use to stage and store timber harvested from Neighbors' property. Neighbors store and process harvested logs in this staging area during their annual harvests for firewood.

21. Neighbors also harvest timber from their property for sale to others, in conformance with their forestry management plan. To complete their timber harvest (both for firewood and logging), Neighbors and their forestry contractors will bring several pieces of equipment onto their property, including chainsaws, tractors, skidders, a bulldozer, and an excavator.

22. Neighbors' firewood harvests generally occur each year. Their timber harvests occur less frequently, perhaps only every four or five years, and sometimes even less frequently.

23. Neighbors or their logging contractors conducted only two timber harvests in the last thirteen years, and neither timber harvest lasted for longer than two weeks.

24. Often, especially when their timber harvests are occurring, Neighbors will store timber logs, some as long as sixteen feet, in piles at their staging area. Some of these log piles will reach a height of six feet or more.

25. When Neighbors contract to sell or have the harvested timber removed from their property, 10-wheel logging trucks, sometimes with trailers, and 18-wheel tractor-trailers will set up in the staging area to remove the harvested logs.

6

26.     The neighborhood surrounding Applicants' property is sparsely settled with residential properties. While several lots on French Hill Road across from Applicants' property have been developed with single family homes, none of the homes on these nearby lots will have a view of Applicants' proposed subdivided lots. Subdivision of Applicants' property will not cause a material change in the view shed from all portions of nearby properties, with the exception of the logging road and log staging area on Neighbors' property.

27.     All of the properties in the general neighborhood of Applicants' and Neighbors' homes consist of either vacant land or lots occupied by single family residences. The area properties vary in size from one acre (or less) to much larger in size. Neighbors' property, containing over 190 areas, appears to be the largest parcel in the general area.

28.     The five lots Applicants propose to create by their subdivision, varying in size from 2.4± acres to 7.5± acres, are similar in size to the majority of properties in their general neighborhood.

### III. Traffic

29.     French Hill Road is a town highway. While through traffic regularly uses this public roadway, it principally serves the residential properties in the neighborhoods through which the road passes. The traffic on this public highway is mostly rural in nature.

30.     The highest point on French Hill Road aligns with the boundary line shared by the parties. Travelling easterly from the point where French Hill Road intersects with the parties' common boundary line, the Road travels through a generally level, straight area for several hundred feet, past the proposed boundary line between Lots 1 and 5. French Hill Road then follows a downhill slope and turns in a southeasterly direction, past Applicants' existing driveway and past their proposed Lot #2. See Exhibit B.

31.     Applicants decided not to design their subdivision with a driveway that was shared with the existing driveway to their home on what will become Lot 1, because they have experienced difficulty in roadway visibility from their driveway due to the westerly uphill slope of French Hill Road in the vicinity of their driveway and the fact that the Road levels off just to the west of their driveway, restricting their view of traffic coming from the west.

32.     Applicants' property hosts several Class III wetlands, particularly in the area designated as Lot 5. One of the wetlands on Lot 5 straddles the parties' common boundary line, with wet areas existing on both Neighbors' and Applicants' property.

7

33. Applicants and their engineer originally designed a shared driveway for Lots 3, 4, and 5 that avoided the wetlands on Lot 5 and was closer to the common boundary line between Lots 1 and 5. They revised their site plan by moving the shared driveway to the west, closer to the boundary shared with Neighbors.

34. Applicants' original shared driveway plan (shown on Exhibit 4) does not employ a circular driveway turn around, but rather employs a "hammerhead" design for vehicles to use when reversing direction on the drive. A "hammerhead" turn around is as effective as a circular traffic lane for turning vehicles. The "hammerhead" design employed by Applicants in their original shared driveway design, as well as the drive's alternate location, appears to require less cutting of trees and less disturbance of vegetation.

35. Town officials requested that Applicants relocate the shared driveway to the revised location, described above, believing that the site distances from the driveway/roadway intersection would be improved. Our trial evidence revealed that the sight distances were not significantly different. More importantly, both the original and revised locations for the proposed shared driveway provide sight distances that comply with the guidelines adopted by the American Association of State Highway and Transportation Officials, commonly referred to as the "ASHTO Guidelines."

36. Neighbors suggest that Applicants revise their shared driveway plan further, so that the shared driveway aligns with the existing driveway for Applicants' home (Lot 1) and thereby allowing for four lots (Lots 1, 3, 4, and 5) to share that driveway.

37. Relocating the shared driveway to Lot 1 would make for a less safe intersection with French Hill Road, since the intersection sight distances to the east would be lowered significantly. See Exhibit J.1

38. French Hill Road provides for the regular, safe travel of vehicles. No accidents have been reported to town or state authorities within the last five years along the portion of the Road that abuts the proposed subdivision.

39. The posted speed limit for French Hill Road is 30 MPH and is in keeping with the rural character of this neighborhood.

40. The proposed subdivision will generate little additional traffic on French Hill Road. Even during the peak hour of traffic generation, less than five one-way vehicle trips will be generated to and from the shared driveway on the proposed subdivision. No new traffic will be

8

generated to or from Lot 1, since that portion of Applicants' property already hosts their residence. Lot 2 will contribute little additional traffic, since the driveway on Lot 2 will only serve a single residence.

**IV. Aesthetic Impacts**

41. All land within the proposed subdivision is wooded; there are no open fields or significant cleared areas within the proposed subdivision, other than near the pre-existing residence on Lot 1.

42. Neighbors' concerns focus on the area to be developed as Lots, 3, 4, and 5, particularly the areas of Lots 3 and 5 that adjoin Neighbors' boundary and logging road.

43. The brush and trees that populate Lots 3, 4, and 5 provide sufficient cover to screen all views of lands within the subdivision, except for views in the immediate vicinity of Neighbors' adjoining boundary.

44. Applicants do not propose to cut any tress or remove vegetation from any areas of the subdivision. They propose that trees and vegetation will be removed, if their subdivision plan is approved, by those to whom they sell the individual lots. Applicants do not seek approval for any development of the individual lots by the subdivision application they have presented. Rather, any future owner or developer of any of the individual lots will be required to submit a further application concerning such future development, and no such development may occur until such an application has received final approval.

45. Applicants do not propose by this subdivision application to clear any of the individual building sites on any of the proposed lots.

46. Even with the clearing anticipated for the proposed on-site waste disposal systems and driveways, including the driveway to be shared by Lots 3, 4, and 5, the subdivided lots will retain much of their vegetative cover and their aesthetic characteristic of a wooded area.

47. Once developed, the subdivided lots are not likely to interfere with the views or aesthetic settings of the adjoining properties, due in particular to the trees, vegetation, and other natural screening that will remain on the proposed subdivision.

48. The subdivision as proposed will cause four residences to be added to the immediate neighborhood. Such a minimal addition will be common to and in keeping with the established uses of nearby properties.

9

## V. Impacted Wetlands; Stormwater Runoff

49.     Applicants' property consists of mostly dry, well-draining lands.  There are no wetlands on the property classified for protection by state or federal authorities (i.e., no Class I or Class II wetlands have been identified on the property).

50.     There are, however, several Class III wetlands on Applicants' property, including in the area where Applicants propose the shared driveway for Lots 3, 4, and 5.  The shared driveway, as currently proposed, will encroach upon some portions of these wetlands, including with unspecified amounts of fill that will be brought in to some of the wet areas for the shared driveway and underground utility lines.  The development of the shared driveway and installed utilities will impede the flow of water in and through these wetlands, including stormwater and groundwater that collect in these wet areas and flows through Applicants' property.  One wetland in particular, near French Hill Road, straddles the parties' common boundary; water currently flows from Neighbors' property onto Applicants' property through this wetland.  See Exhibit B.

51.     Applicants and their expert offered scant details of how the shared driveway would be built and what measures would be employed during and after construction to limit possible erosion of soils during and after construction.  Applicants' expert explained that their theory was that such design and construction details could be created and revealed at the time of construction.

52.     The current plan to fill in certain wetlands to accommodate Applicants' current plan for the shared driveway does not include a culvert or culverts that would allow for the natural flow of storm- and groundwater.  Without one or more culverts, the shared driveway Applicants proposed at trial is likely to create a dam effect in these areas and increase the impoundment of storm- and groundwater.  Some of this ground- and stormwater impoundment could back up onto Neighbors' property.  Thus, this shared driveway is likely to impact and impede the flow of stormwater and groundwater across Neighbors' land, Lots 5 and 3.

53.     A narrow, intermittent stream flows from one of the Class III wetlands on Lot 5 and in a general westerly direction over Lot 3 and then crosses onto Lot 2.  Another stream flows from the wetlands located on Lot 2 (noted below) and in a general northeasterly direction over Lot 2, where it eventually meets the stream flowing from Lot 3.  The stream wholly on Lot 2 is also

intermittent; it and the Lot 3 stream often are dry and do not host flowing water during several months of the year.

54. An additional Class III wetland straddles the boundary between Lots 3 and 4; a fourth wetland is located wholly on Lot 3. Neither of these additional wetlands will be impacted by the driveways or on-site wastewater treatment systems proposed for this subdivision.

55. An additional Class III wetland lies on Lot 2, westerly of the areas proposed to be disturbed for that Lot's driveway, building site and on-site wastewater treatment system. No portions of the developments proposed for Lot 2 will impede the storm- and groundwater that flows through this wetland.

56. Applicants originally secured a permit from the Vermont Agency of Natural Resources, Division of Environmental Conservation ("DEC") for their proposed on-site wastewater treatment and potable water supply systems. A copy of that permit, Permit #WW-6-2242, was admitted at trial as Exhibit H. This Permit was based upon plans that included Applicants' original shared driveway plan that did not impact the wetlands on Lot 5, but rather was located closer to the boundary between Lots 1 and 5. The location of Applicants' original shared driveway is depicted upon their original site plan, prepared by their expert in connection with their application for Permit #WW-6-2242; a copy of that site plan was admitted at trial as Exhibit 4.

57. Once Applicants relocated the shared driveway, at the suggestion of one or more Town officials, they submitted revised plans to DEC and obtained Amended Permit #WW-6-22-1, which is referenced on their revised site plan (Exhibit B).

58. No party appealed Applicants' wastewater and water supply permits, which have now become final.

59. Applicants' planned subdivision development, including the shared driveway in its revised location, calls for less than one acre of land to become impervious surfaces (i.e., driveways, etc.). Because of this, Applicants need not obtain a state stormwater discharge permit.

60. It is unclear from the evidence presented whether Applicants' original design for the shared driveway would create more than one acre of impervious surfaces.

11

61.     As proposed, neither the original nor relocated shared driveway, nor any other development work proposed in this subdivision application, calls for any material disturbance of the vegetated buffers along streams located on Applicants' property.

62.     The Class III wetland that straddles the boundary line between Neighbors' and Applicants' property allows for the flow of ground- and storm water from Neighbors' land onto Applicants' land. However, no credible evidence was offered at trial of ground- or stormwater flowing from Applicants' property onto the adjoining properties. This characteristic of Applicants' property is principally due to the gentle sloping of the property and the trees and other vegetation throughout the property. Principally because of the limited clearing of trees and vegetation that is proposed in the pending application, the proposed subdivision is unlikely to increase the flow of ground- and stormwater off of Applicants' property.

## Discussion

By the pending application, Applicants propose to subdivide the 29-acre property on which they now live into five lots, with their existing home to occupy their proposed Lot 1 and four additional homes occupying the four other lots. Applicants only seek approval for their proposed subdivision plan; they do not seek approval for the tree and vegetation clearing or the construction that will be necessary to develop the four new house sites. Rather, Applicants intend, if they obtain final approval for their proposed development, to only secure subdivision approval and leave it to the future owners to secure any additional approvals for the actual construction of their proposed development.

Thus, we begin our analysis with this recognition of what Applicants seek by their pending application; we limit our analysis to the potential impacts from the land uses proposed in the pending application. This subdivision application seeks approval merely for the subdivision of land. When such an application does not provide the specifics on how the individual lots will be developed, that future development is not the domain of the subdivision application process, but rather of construction applications that must be submitted and reviewed in the future before any actual clearing or construction may begin. See In re Appeal of Baker and Johns, No. 2006-364 (Vt. Sup. Ct. May Term, 2007) (unpub. mem.), citing In re Taft Corners Assocs., 171 Vt. 135, 141 (2000). We therefore review the possible impacts of the proposed subdivision within the context of the applicable provisions of the Town of St. Albans Zoning Bylaws & Subdivision Regulations (2009) ("the Regulations"). We do not consider how

12

the development on each of the four new lots will occur, what impacts that construction and development will cause, or whether that construction and development conforms to all applicable Regulations; we leave that review to the proceedings where full disclosure is made of that construction and development.

Our review in a de novo appeal from a municipal land use determination is limited to the legal issues presented by an appellant in its statement of questions. V.R.E.C.P. 5(f). When one or more parties file pre-trial motions, we often narrow the legal issues to be addressed at trial by a pre-trial decision or entry order. Pre-trial motions can help focus the trial time of the parties and the Court to the factual and legal issues that are truly in dispute.

By our pretrial decision on the parties' cross-motions for summary judgment and dismissal,[1] we narrowed the factual and legal issues that remained to be addressed at trial to 11 of Neighbors' 25 Questions, as noted above on pages 2 and 3. We believe that the remaining eleven legal issues fall into three categories and therefore organize our legal analysis into the following three categories:

## I.      Compatibility of the Proposed Subdivision (Neighbors' Questions 3, 4, 7, and 10)

The Regulations contain specific provisions that control review of subdivision applications. Since Part II of the Regulations includes the applicable criteria, review procedure, and development standards that govern subdivisions, we focus our review of the legal issues raised in Neighbors' remaining Questions to the applicable provisions of Part II of the Regulations.

By their Question 3, Neighbors challenge whether Applicants' proposed subdivision complies with the general planning standard contained in Regulations § 220(3) that the proposed development shall be "'compatible with adjacent land uses' . . . given that the size of the proposed lots is less than existing surrounding lots." (Applicants' Clarified Statement of Questions at 1, filed March 15, 2011.) We address this Question in short order, since the credible evidence presented at trial showed that the proposed lots are of a size similar to many of the properties in the area near Applicants' proposed subdivision. While it is true that one of Applicants' proposed lots—Lot 5—is of a relatively small size (2.4± acres), several of the lots near the proposed subdivision are of a similar or even smaller size, as evidenced by a portion of

---

[1] See In re Bibby 5-Lot Final Plat, No. 189-11-10 Vtec slip op. at 27 (Vt. Super. Ct. Envtl. Div. Mar. 2, 2012) (Durkin, J.).

the area municipal tax map, a copy of which Applicants submitted as Exhibit G. Certainly there are larger parcels of land in the parties' neighborhood, including Neighbors' property (which is the largest area parcel at 190 acres) and the remaining lots in Applicants' proposed subdivision (ranging in size from 6.2± to 7.5± acres), but all of Applicants' proposed lots conform to the range of sizes for area land parcels. For this reason, we conclude that the subdivision as proposed does not conflict with this compatibility provision from Regulations § 220(3).

In their Question 4, Neighbors challenge whether Applicants' proposed subdivision conforms to the second portion of Regulations § 220(3), which requires that the "development scheme . . . shall provide sufficient open space for recreation and to safeguard the privacy of the area inhabitants." Applicants have designed their proposed subdivision with the privacy of area inhabitants in mind. They have proposed lots that conform to the densities that exist in their neighborhood and that are much larger than the minimum lot sizes allowed in the applicable zoning districts. The subdivision itself and the access ways proposed for each lot limit the cutting of trees and clearing of vegetation; this plan continues the wooded character of Applicants' property and other neighboring properties. The suggested locations of the individual residential house sites and on-site wastewater and water supply systems maintain the wooded character of the land as well. As designed, the undeveloped areas on each lot provide for on-site recreation that will likely avoid disturbances to the privacy of residents of nearby properties. We therefore conclude that the proposed subdivision conforms to this second portion of Regulations § 220(3).

Regulations § 221(1)(C) is part of the "Required Improvements and Design Standards" specified in Part II of the Regulations. By their Question 7, Neighbors assert "that the proposed lots do not produce the safest, most healthful and attractive building sites considering the topography, drainage, soils, vegetation, and other natural features on the property" and therefore do not conform to Regulations § 221(1)(C).

Regulations § 221(1)(C) provides that the "[l]ayout of lots . . ., wherever feasible shall . . . produce the safest, most healthful and attractive building sites for the topography, drainage, soils, vegetation, and other natural features on the property." In considering this required improvement and design standard, our review is limited by the limited development that Applicants propose; they do not seek approval for actual construction on the individual sites and concede that future developers will be required to disclose and obtain approval for their

14

construction plans. Nonetheless, Applicants' plans exhibit limited building envelope areas and provide a design layout that maintains nearly all of the natural features of their property. Applicants' expert credibly testified that their design and lot layout, including driveways, wastewater, and water supply systems, would cause tree and vegetation clearing on less than five percent of the total area of their property. The building envelopes are spaced adequately apart and provide sufficient isolation distances between each building area and neighboring properties. With the exception of the drainage concerns expressed below regarding the location Applicants proposed at trial for the shared driveway, we find that no drainage issues will result from Applicants' proposed subdivision. Neighbors provided little evidence of alternate layout and design plans, and we conclude that Applicants' subdivision layout provides for the safest, most healthful and attractive building sites in light of the natural features on their property. We therefore conclude that Applicants' proposed subdivision conforms to Regulations § 221(1)(C).

## II.     Proposed Driveways and Traffic Impacts (Neighbors' Questions 5, 6, 13, and 14)

By their Question 5, Neighbors assert that Applicants' proposal of a shared access for Lots 3, 4, and 5 will fail to comply with the planning standard of Regulations § 220(4) because "unsafe conditions" will result, both as to the public roadway known as French Hill Road and the neighbors' private logging road. We review Neighbors' assertions of unsafe conditions on each road separately.

We see no merit in Neighbors' assertions that the proposed subdivision will cause unsafe conditions on French Hill Road. This subdivision will cause only a small increase in traffic on that public highway. We found Applicants' expert's assessment of the safety of both the original and revised shared driveway most credible, including his assertion that his analysis of the traffic impacts was somewhat unique because traffic analysis of such a small subdivision rarely occurs. Ironically, the alternative that Applicants presented —a shared driveway on Lot 1—would likely be less safe than either of the alternatives proposed by Applicants, because of less safe sight distances of oncoming traffic. Both of the options for a shared driveway on Lot 5 that Applicants presented provide safe intersections with French Hill Road. This subdivision will generate little additional traffic for that public highway. We therefore conclude that Applicants' proposed subdivision will not cause unsafe conditions on French Hill Road.

We must clarify one part of the driveway designs proposed by Applicants' expert. When challenged by Neighbors and their expert, Applicants' expert conceded that each new

15

driveway will have a level area just prior to its intersection with French Hill Road. A level area on a driveway just prior to its intersection with a public roadway provides for a safer opportunity for vehicles to enter the highway from the roadway. Applicants' expert offered that the driveways, when constructed, would conform to the recommendations of the Vermont Agency of Transportation ("VTrans") for residential driveways, as depicted in the guidelines commonly known as the VTrans "B-71 Standards," a copy of which was admitted as Exhibit 9. We will condition our approval of Applicants' subdivision on conformance to the B-71 Standards, so that Applicants' commitment on this point is memorialized in our approval.

We similarly do not believe that the proposed development will cause unsafe conditions on Neighbors' adjacent logging road, for the very same reasons stated in the preceding paragraph. Neighbors' concerns here were premised not upon unsafe conditions on their logging road that will directly result from the subdivision; they are more concerned that the proximity of their logging road will create an "attractive nuisance" for those travelling on the shared driveway. Since we decide below for other reasons to require a relocation of the shared driveway, we do not analyze Neighbors' concerns here further. The relocation of the shared driveway to the location originally proposed by Applicants minimizes or negates Neighbors' concerns, to the extent that they can be characterized as safety concerns that are protected by Regulations § 220(4). For all these reasons, we conclude that the proposed subdivision, as modified and conditioned below, conforms to Regulations § 220(4).

By their Question 6, Neighbors suggest that the proposed subdivision does not comply with the required improvements and design standard of Regulations § 221(1)(B) by not, "wherever feasible, . . . utiliz[ing] common driveways for adjacent lots." Id. The credible facts presented cause us to conclude otherwise. Applicants have proposed two alternatives for a shared driveway for three of their five proposed lots. "Utilizing" a more extensive common drive would have led to a less safe intersection with French Hill Road; comingling the shared driveway with the existing driveway on Lot 1 would have led to less safe sight distances and unnecessary tree clearing for internal driveways that would have increased the impervious surfaces within the proposed subdivision. Applicants have presented a thoughtful plan for sharing the access way for lots 3, 4, and 5. We conclude that the proposed subdivision, incorporating the shared driveway that Applicants originally proposed, conforms with Regulations § 221(1)(B).

16

Lots created by a subdivision normally must conform to the minimum road frontage requirements for their host zoning district. An applicant may receive a waiver from the district road frontage requirement if his or her plan satisfies the requirements of Regulations § 401. By their Questions 13 and 14, Neighbors assert that the proposed subdivision does not comply with some of the Regulation provisions concerning access to land development (Regulations § 400(1)) and that Applicants are not entitled to a waiver for the two lots in their subdivision that will not have road frontage.[2] For the following reasons, we conclude otherwise.

Two of Applicants' proposed lots (Lots 3 and 4) do not have frontage on a public road. Further, while Neighbors initially challenged Applicants' assertion about the right-of-way dimensions, they did not specifically dispute Applicants' presentation that the shared driveway Applicants initially proposed will be twenty feet wide, with a gravel travelled lane of about sixteen feet. Neighbors' concerns may have been piqued by the lack of specifics on Applicants' plans, in regards to both the construction of the shared driveway and how the right of way will be established in the conveying documents. However, those concerns were eliminated, at least for the Court, by suggested conditions for approval that are incorporated into our Conclusions below.

Regulations § 401 allows for a road frontage waiver to be granted when a subdivision creates land-locked parcels, provided that "a permanent right-of-way, of at least twenty feet in width . . ., provides access to not more than two single-family dwellings that do not have adequate road frontage." Id. Applicants' subdivision plan satisfies these requirements and thereby conforms to Regulations § 401. With this criteria met, we **GRANT** Applicants a waiver from the road frontage requirement for their proposed Lots 3 and 4. With that waiver in hand, Applicants conform to the land development access requirements of Regulations § 400 because their Lot 5 has adequate road frontage and the waiver granted above allows for easement access for their Lots that do not have road frontage. We therefore conclude that Applicants' proposed subdivision conforms to Regulations §§ 400 and §401.

III.     **Protection of Trees, Water Bodies, and Other Natural Features (Questions 2, 11, and 19)**

State and federal laws provide for protection of significant wetlands, lakes, and streams and because of the magnitude of those regulations, any discussion of wetland protections often begins with the classification of wetlands under federal or state law, based upon their

---

[2] Road frontage waivers are governed by Regulations § 401.

17

significance. But one would be mistaken to limit an interpretation of protections afforded by municipal regulations to only those wetlands and other natural resources that are deemed significant under federal or state law. In fact, the Town here has chosen to require some appreciation, if not outright protection, for "existing trees, scenic points, brooks and water bodies and other natural and cultural features of the area" of a proposed development. Regulations § 220(2). Neighbors suggest by their Question 2 that Applicants' proposed subdivision fails to provide "due regard" for these natural features. For the reasons detailed below, we agree with Neighbors, but conclude that with certain conditions, Applicants' proposed subdivision may be approved.

We next summarize Neighbors' Questions 11 and 19, since they raise similar concerns. By their Question 11, Neighbors question whether the proposed subdivision conforms to the Regulation § 221(6) requirement that "[v]egetated buffers along stream banks . . . be maintained or enhanced . . . for filtration, erosion control, and aesthetic purposes." By their Question 19, Neighbors ask whether the proposed subdivision provides sufficient drainage facilities pursuant to Regulations § 221(5), which states:

> Drainage Facilities shall be provided sufficient to accommodate the two and ten year return period storm runoff from all roads, lots and upstream drainage areas, whether inside or outside the development. Post-development runoff/drainage (volume & rate) shall not exceed Pre-development runoff/drainage (volume & rate). The Development Review Board shall not approve a drainage system that would overload downstream drainage facilities or cause flooding on other lands or results in increased public expenditure, until proper provision has been made for the improvement of such conditions. Adequate provision shall be made to minimize erosion during and after construction. All drainage system easements shall be shown on the plat.

We first address Applicants' challenges in their Question 11, since it presents the least dispute and concerns. The parties do not dispute the number and location of the streams located on Applicants' property. While they seemed to dispute the significance of those streams (Applicants' expert refers to those streams as intermittent; Neighbors' expert afforded more significance to those streams), we do not concern ourselves with defining how significant these streams are, since the Regulations do not provide less protection for streams that only run intermittently. Even intermittent streams provide valuable functions in the flow of ground- and stormwater over property and the regulations appear to respect this characteristic by not limiting its buffer protection to only "significant" streams.

18

We conclude, however, that Applicants' subdivision plan does not provide for disturbances of streams, their banks, or their buffers. Neighbors' concerns appear to be focused upon the disturbances that may occur when actual development of the individual lots occurs. But, as we note above, the pending application does not seek approval for the actual construction or development of the individual lots, and Applicants or their successors cannot build on or develop the individual lots until they apply for and receive the necessary construction permit. Because the development that may cause Neighbors' concerns about interference with streams is not the subject of the pending application, we do not consider it here.[3] We therefore conclude that the proposed subdivision conforms to that portion of Regulations § 221(6) that Neighbors cite in their Question 11.

Neighbors' Questions 2 and 19 raise some overlapping concerns, so we address these final two Questions together. First, we note that Applicants' subdivision design offers due regard and respect for the existing trees and scenic points both on their property and on adjoining properties. Applicants have carefully limited the cutting and clearing necessary to install the on-site wastewater treatment and water supply systems and either of their proposed shared driveways for Lots 3, 4, and 5. The lay of their land helps in their efforts to minimize the adverse impacts to adjoining property owners, since their land slopes to the east, which is away from the closest residences. The future owners and developers of these lots will need to exercise caution in their development plans, particularly as to the amount of trees and vegetation that they propose to clear, since the existing vegetation provides adequate screening for Applicants' property as it exists today. Little notice appears to have been taken of the limited development already on Applicants' property, and the proposed subdivision is unlikely to change the attention that Applicants' property will draw from neighbors in the future.

We are concerned, however, with the lack of detail provided for how the shared driveway Applicants now propose will encroach upon the wet areas on Lot 5 that host the flow of ground- and stormwater from Neighbors' through Applicants' property. We find troubling the suggestion by Applicants' expert that the design details of the driveway construction and general erosion control measures can be devised when actual construction occurs. Our concerns on this point are increased by Applicants' suggestion that they will not be involved in

---

[3] Applicants conceded at trial that a pipe leading to or from an on-site sewage treatment or water supply systems may cross a stream on Lot 3. To the extent that that pipe will cross a stream, we conclude that the encroachment into the stream, its bank and buffer will be insignificant.

this site development, but rather will leave that work to successive owners, none of whom are now known or are parties to these permit proceedings. For these reasons, we condition our approval upon Applicants providing a revised site plan that provides clear direction that the actual construction must conform to the accepted field standards employed for erosion control and earth disturbances. Both parties' experts agreed that for this site, a commitment must be made to conform to two guidelines: (1) the Vermont Standards and Specifications for Erosion Prevention and Sediment Control and (2) the Low Risk Site Handbook. We include these conformance requirements in the conditions of approval that we impose below.

Of greater concern to the Court is the planned encroachment and filling of the wetlands adjacent to the parties' common boundary. The proposed shared driveway has no respect in its design for the current flow of ground- and stormwater. This design deficiency could be easily remedied, perhaps, by incorporating one or more drainage culverts under the proposed driveway. While Neighbors made this and other suggestions at trial, Applicants chose not to incorporate culverts in the driveway design they presented, instead deferring to whatever might be consider warranted at the time of construction. We find Applicants' suggestion unacceptable, as a driveway designed without culverts is likely to cause the impounding of water on their own or Neighbors' property, or both.

Of additional concern, although not directly related to water flow, is the proximity of the proposed shared driveway to the parties' shared boundary. In some sections, particularly where Applicants have proposed a circular turn around, the driveway structure nearly abuts the parties' common boundary line. An historic stone wall generally runs along this common boundary line and will likely be damaged or destroyed during construction of the shared driveway. This historic stone wall is a scenic feature to both Neighbors' and Applicants' property. While Neighbors' home is some distance from this common boundary line, Neighbors frequent this portion of their property regularly to harvest and process firewood and to walk along their logging road. With little distance between the proposed shared driveway and the common boundary line, there will be little or no natural screening remaining after Applicants' subdivision is developed. We therefore conclude that this location of the shared driveway conflicts with Regulations § 220(2) because it does not pay due regard and respect for the scenic and natural features of the areas along the parties common boundary.

20

Applicants are to be commended for including a shared driveway in the design of their five-lot subdivision. Shared driveways, after all, are encouraged by Regulations § 401. But there's a certain irony here, since Applicants originally located their shared driveway on the opposite side of Lot 5, away from Neighbors' boundary. That original location, shown on Exhibit 4, was to be several hundred feet to the east, along French Hill Road. This original location and design also avoided encroaching into the wetland near Neighbors' boundary. But Town officials suggested that Applicants move their shared driveway closer to Neighbors' boundary, in an attempt to improve the sight distances from the proposed shared driveway.

Trial testimony confirmed that the original location for the shared driveway may cause the intersection sight distances to be reduced to the east, but not below the recommended sight distances for a rural road with a 30 MPH speed limit, such as French Hill Road. The Town chose not to offer trial testimony on this point and we have concluded that the intersection sight distances from the original shared driveway location will not cause the "unsafe conditions" that Regulations § 220(4) directs that future developments protect against.

For these reasons, we condition our approval of Applicants' proposed subdivision on the relocation of the shared driveway for Lots 3, 4, and 5 to the original location Applicants proposed, as depicted on Exhibit 4, conditioned upon conformance with the site and erosion control guidelines mentioned above.

With this condition in place, we conclude that Applicants' proposed subdivision, as revised, will pay due regard and respect for the "existing trees, scenic points, brooks and water bodies and other natural and cultural features of the area" and therefore conform to Regulations § 220(2). We further conclude that the proposed subdivision, as conditioned below, will provide for adequate drainage and satisfy the requirements of Regulations § 221(5).

## Conclusion

For all the reasons detailed above, we conclude that Applicants' proposed subdivision of their 29± acre parcel of land on French Hill Road into five lots, with Lot 1 including their existing residential structures and driveway and one additional residence on each of the remaining four lots, conforms to the applicable provisions of Part II of the Town of St. Albans Zoning Bylaws and Subdivision Regulations, subject to the following conditions:

1. Applicants shall revise their subdivision site plan to reflect the relocation of the shared driveway for Lots 3, 4, and 5, as reflected on their original plan (Exhibit 4)

21

and incorporate into the Notes section of the revised site plan the additional conditions listed below.

2. All site work must conform to (1) the Vermont Standards and Specifications for Erosion Prevention and Sediment Control and (2) the Low Risk Site Handbook.

3. All driveway intersections with French Hill Road shall conform to the VTrans B-71 Standards for residential driveways.

4. No sale of the individual lots or site construction may occur until Applicants have submitted this revised site plan to the Town of St. Albans Zoning Administrator and that officer has confirmed conformance of the revised site plan to these conditions, in writing affixed to the revised site plan.

5. Applicants shall cause the easement language and shared maintenance agreements for the shared driveway for lots 3, 4, and 5 to be drafted, provided to the Town Zoning Administrator and any purchaser prior to entering into a purchase and sale contract for those Lots. No site construction or title transfer may occur until these draft easements and road maintenance agreements are received by the Zoning Administrator.

This completes the current proceedings before this Court concerning this subdivision application. A Judgment Order accompanies this Merits Decision.


Done at Newfane, Vermont this 30th day of May, 2013.


_____
Thomas S. Durkin, Environmental Judge